# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## DARLING V. CITY OF NEWPORT NEWS.

### June 13, 1918.

1. WATERS AND WATERCOURSES—*Pollution—Distinction Between Non-Navigable Stream and Tidal Navigable Bodies.*—There is a marked and well defined distinction between the pollution of a small non-navigable stream, and the pollution of large tidal navigable bodies of salt water, for the reason that in the first case the bed of the stream and the waters are owned by the riparian owners while in the latter case the bed of the navigable, tidal salt water and the waters themselves are owned and controlled by the State, for the use and benefit of all the public, subject only to navigation. It is for the State to say what uses shall be made thereof and by whom, subject always to the right of the public, and for the State, through the legislative branch of the government, to say how much pollution it will permit to be emptied into and upon its waters, so long as the owners of the land between low water and high water mark are not injured.

2. WATERS AND WATERCOURSES—*Pollution—Tidal Waters—Sewers—Municipal Corporations—Oysters—Damnum Absque Injuria.*—A municipal corporation situated on an arm of the sea, adjacent to tidal waters, has the right to use such waters for the purpose of carrying off its refuse and sewage to the sea, so long as such use does not create a public nuisance, and any injury occasioned thereby to private oyster beds is *damnum absque injuria.*

3. STATE—*Waters and Watercourses—Constitutional Law.*—The power of the sovereign State or nation is perpetual, not exhausted by one exercise, and all privileges granted in public waters are subject to that power, the exercise of which is not the taking of private property for public use, but only the lawful exercise of a governmental power for the common good.

4. STATUTES—*Construction—Grants in Derogation of Public Right.*—Grants in derogation of the common or public right are always

strictly construed against the grantee. Nothing passes except what is granted specifically or by necessary implication.

5. OYSTERS—*Leases—Construction of Statute—Rights of Planter.*— A lease under the Virginia oyster law is made only "for the purpose of planting and propagating oysters thereon," and it is for this purpose alone that the planter is authorized to use and occupy such ground—that is to say, that while any citizen might have taken oysters therefrom before the grant, afterwards he only may do so and all others are excluded from either planting or taking oysters from such ground during his term; this marks the limit of his right, for there is nothing to indicate that any other public or private right is withdrawn, limited or curtailed. He does not take a fee simple title, nor can he use the property for any other purpose except for that stated in the statute, and hence every other right heretofore in the public is preserved. Nor is there any language in the statute indicating any intent to destroy or impair any of the ancient rights of the riparian owners.

6. OYSTERS—*Leases—Construction of Statute—Rights of Planter.*— Under the Virginia statute (Acts 1910, chapter 343), as construed by the Supreme Court of Appeals the oyster planter takes his right to plant and propagate oysters on the public domain of the Commonwealth in the tidal waters, subject to the ancient right of the riparian owners to drain the harmful refuse of the land into the sea, which is the sewer provided therefor by nature; while another statute (Acts 1916, page 51) provides for the examination of such oyster-planting grounds so as to discover polluted areas, and prohibits the taking of oysters therefrom except for the purpose of removing them to unpolluted waters, there to remain until cleansed, purified and made suitable for human food.

Appeal from a decree of the Circuit Court of the city of Newport News. Decree for defendant. Complainant appeals.

*Affirmed.*

The opinion states the case.

*Jones & Woodward* and *J. Winston Read,* for the appellant.

*J. A. Massie,* for the appellee.

PRENTIS, J., delivered the opinion of the court.

The appellant filed his bill against the appellee, basing his claim for relief upon the fact that he is the lessee from the State of very valuable oyster planting grounds located in Hampton Roads, on the northern side thereof near the city of Newport News, and that a considerable portion thereof has already been damaged and the oysters thereon polluted because of the sewer system of the city, which conducts sewage into Salter's creek and thence into the tidal waters of Hampton Roads, across appellant's oyster beds, and that other and greater damage therefrom is probable. To this bill the appellee filed a demurrer, which the lower court sustained because of opinion that the case of *Hampton* v. *Watson,* 119 Va. 95, 89 S. E. 81, L. R. A. 1916F, 189, is controlling upon the main question involved.

In this conclusion of the trial court we concur. The syllabus of that case fairly states the conclusions of this court as follows:

"1. There is a marked and well defined distinction between the pollution of a small non-navigable stream, and the pollution of large tidal navigable bodies of salt water, for the reason that in the first case the bed of the stream and the waters are owned by the riparian owners while in the latter case the bed of the navigable, tidal salt water and the waters themselves are owned and controlled by the State, for the use and benefit of all the public, subject only to navigation. It is for the State to say what uses shall be made thereof and by whom, subject always to the right of the public, and for the State, through the legislative branch of the government, to say how much pollution it will permit to be emptied into and upon its waters,

so long as the owners of the land between low water and high water mark are not injured.

"2.   A municipal corporation situated on an arm of the sea, adjacent to tidal waters, has the right to use such waters for the purpose of carrying off its refuse and sewage to the sea, so long as such use does not create a public nuisance, and any injury occasioned thereby to private oyster beds is *damnum absque injuria.*"

Additional authorities to those cited in *City of Hampton* v. *Watson, supra,* (all relating, however, to the Federal government) to the effect that the power of the sovereign State or nation is perpetual, not exhausted by one exercise, and that all privileges granted in public waters are subject to that power, the exercise of which is not the taking of private property for public use, but only the lawful exercise of a governmental power for the common good, are: *Scranton* v. *Wheeler,* 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126; *Greenleaf Johnson Lumber Co.* v. *Garrison,* 237 U. S. 251, 35 Sup. Ct. 551, 59 L. Ed. 939; *Willink* v. *United States,* 240 U. S. 572, 36 Sup. Ct. 422, 60 L. Ed. 808; *State* v. *Cleveland, etc., Ry. Co.,* 94 Ohio St. 61, 113 N. E. 677, L. R. A. 1917 A, p. 1014.

The appellant relies upon *Huffmire* v. *Brooklyn,* 162 N. Y. 584, 57 N. E. 176, 48 L. R. A. 421, and this case appears to sustain his contention, though it is observed that the New York statute, under which the owner of the oyster bed claimed there, provided that he should have "the exclusive property in the oysters so planted and the exclusive use of such oyster beds" (Laws 1868, c. 734), while the Virginia statute employs different language and provides that the oyster beds may be occupied "for the purpose of planting or propagating oysters thereon," and that so long as the rent is paid annually in advance the State will guarantee to the renter for twenty years, "the absolute right to continue to use and occupy such grounds, sub-

3

ject only to the right of fishing in the waters above the said bottom." Secs. 6 and 9, General Oyster Law. (Acts 1910, p. 543).

In *Seaman* v. *New York*, 176 App. Div. 608, 161 N. Y. Supp. 1002, the pollution of tidal waters by sewage is held *damnum absque injuria*, as to a riparian owner who had his oysters, over which, while stored in his cellar, the polluted waters of Jamaica Bay ebbed and flowed.

The authorities upon the general subject are collected and summarized in the note to *Winchell* v. *Waukesha*, 110 Wis. 101, 85 N. W. 668, 84 Am. St. Rep. 921, and in 9 R. C. L. 682.

Grants in derogation of the common or public right are always strictly construed against the grantee. Nothing passes except what is granted specifically or by necessary implication.

As Mr. Justice Shiras states the rule in his dissenting opinion in the case of *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 468, 13 Sup. Ct. 124, 36 L. Ed. 1048: "It must be conceded, *in limine*, that, in construing this grant, the State is entitled to the benefit of certain well settled canons of construction that pertain to grants by the State to private persons or corporations, as, for instance, that if there is any ambiguity or uncertainty in the act, that interpretation must be put upon it which is most favorable to the State; that the words of the grant, being attributable to the party procuring the legislation, are to receive a strict construction as against the grantee; and that, as the State acts for the public good, we should expect to find the grant consistent with good morals and the general welfare of the State at large and of the particular community to be affected."

Applying this rule to the grants made under the Virginia oyster law, we find that the lease is made only "for the purpose of planting and propagating oysters thereon," and it

is for this purpose alone that the planter is authorized to use and occupy such ground—that is to say, that while any citizen might have taken oysters therefrom before the grant, afterwards he only may do so and all others are excluded from either planting or taking oysters from such ground during his term; this marks the limit of his right, for there is nothing to indicate that any other public or private right is withdrawn, limited or curtailed. He does not take a fee simple title, nor can he use the property for any other purpose except for that stated in the statute, and hence every other right theretofore in the public is preserved. Nor is there any language in the statute indicating any intent to destroy or impair any of the ancient rights of the riparian owners.

In *Prior* v. *Swartz*, 62 Conn. 132, 25 Atl. 398, 18 L. R. A. 668, 36 Am. St. Rep. 333, it is expressly decided that the right of the riparian owner to build wharves and dig channels to connect his high land with navigable waters is superior to the right of the oyster planter. This right of the riparian owner to build wharves is everywhere recognized. *Miller* v. *Mendenhall*, 43 Minn. 95, 44 N. W. 1141, 8 L. R. A. 89, 19 Am. St. Rep. (note) 231; *Norfolk City* v. *Cooke*, 27 Gratt. (68 Va.) 435.

It is a matter of common knowledge and, therefore, must have been within the contemplation of the general assembly when the law was enacted, that there are vast areas of land in the tidal waters of Virginia remote from the centers of population and suitable for oyster culture. Hampton Roads (in which the appellant occupies 1800 acres of oyster-planting ground, of which 100 acres is alleged to be polluted) is a large, tidal, navigable body of salt water, formed by the confluence of the waters of the Atlantic Ocean, Chesapeake Bay, the James, Elizabeth and Nansemond rivers, Hampton creek, and other smaller streams. That some of its waters have been long polluted and unfit

for the planting of oysters for human food is also apparent from *City of Hampton* v. *Watson, supra.* Upon its shores, or closely adjacent thereto, are the cities of Norfolk, Portsmouth, Newport News and Hampton, the towns of Phoebus and Kecoughtan, and great railway terminals and coaling stations. There is also the large population at Fortress Monroe, the National Soldiers' Home, and in fact along the entire adjacent coast. There the Federal government has recently located large military and naval stations, and is building an immense freight terminal for military purposes. Upon its waters innumerable ships of war and commerce, domestic and foreign, constantly float. From all of these sources the waters of Hampton Roads are constantly subject to pollution and contamination such as is necessarily incident to all such roadsteads. This large population is destined still further to increase, and hence the probable sources of contamination will be increased.

If it be true that the private right of the appellant to continue to use and occupy this territory for the planting of oysters has been so guaranteed by the State as to make his rights superior to the interest of the large public otherwise entitled (within proper limits) to use the waters of Hampton Roads for its sewage, then the burden is clearly upon him to show that this is true. Until this is shown, it is unnecessary to discuss the proposition so urgently and well presented in the dissenting opinion—that is, that the General Assembly possesses unlimited power to grant absolute property rights in the lands of the State lying under the tidal waters.

That the right claimed by the city clearly existed before the enactment of the oyster law cannot be doubted, and the legislature cannot be presumed to have intended to destroy this ancient and undoubted public right in the absence of a clear and explicit statute indicating such purpose. We

think the more reasonable view of the statute is that it was not conceived that it would be thought desirable to continue to plant oysters in an area so certain ultimately to be polluted, and so likely upon inspection by the Federal and State authorities to be condemned as unsuitable for that purpose.

This construction is not, as the dissenting opinion suggests, the substitution of the will and judgment of this court for the will and judgment of the legislature, but on the contrary ascertains and declares the true meaning of the statute in acordance with the will and judgment of the General Assembly, which not only seeks to encourage oyster culture, but has also expressly authorized cities and towns to construct sewers within or without their limits. Acts 1908, p. 624. This conclusion effectuates both of these purposes. The bill seeks to deny to the city of Newport News a privilege which is freely exercised by every ship which sails on these waters, and, except as restrained by local law, by every individual on these shores.

Under the Virginia statute, then, as construed by this court, the oyster planter takes his right to plant and propagate oysters on the public domain of the Commonwealth in the tidal waters, subject to the ancient right of the riparian owners to drain the harmful refuse of the land into the sea, which is the sewer provided therefor by nature; while another statute (Acts 1916, p. 51) provides for the examination of such oyster-planting grounds so as to discover polluted areas, and prohibits the taking of oysters therefrom except for the purpose of removing them to unpolluted waters, there to remain until cleansed, purified and made suitable for human food.

*Affirmed.*

SIMS, J., dissenting:

The decision of this case, so far as the right of recovery of damages is concerned, turns upon the question whether the appellant had a private right of property in the oysters upon or in the oyster planting ground in the bill mentioned.

If such property right existed the city of Newport News, a municipal corporation, had no right to damage or destroy such property by what would have been a private nuisance at common law if created by a private person. 1 Farnham on Waters, sections 138-b, 138-c, 138-d; Gould on Waters, sections 545-6; Joyce on Nuisances, section 284.

Under the Constitution of Virginia of 1902, section 58, the legislative authority of the city does not shield it from liability to make "just compensation" for "damage" it may cause to private property by acts since that Constitution went into effect which would have created a private nuisance at common law although such property be not "taken." 1 Farnham on Waters, section 138-d; note to 48 L. R. A. 691, 698, *et seq.; Swift & Co.* v. *Newport News,* 105 Va. 108, 52 S. E. 821, 3 L. R. A. (N. S.) 404; *Rigney* v. *Chicago,* 102 Ill. 64; 1 Lewis on Em. Domain (3d ed.), sections 16 to 61; 108, 346, 356, 360-1.

As said in the syllabus to *Hampton* v. *Watson,* 119 Va. 95, 89 S. E. 81, L. R. A. 1916 F, 189: "There is a marked and well defined distinction between the pollution of a small non-navigable stream and the pollution of large tidal navigable bodies of salt water;" but this distinction, as also stated by such syllabus, exists only "for the reason that in the first case the bed of the stream and the waters are owned by the riparian owners, while in the latter case the bed of the navigable, tidal salt water and the waters themselves are owned and controlled by the State * * *" With respect to private exclusive rights of ownership which may be and have in fact been acquired from the Commonwealth

there is no distinction between the liability in damages for a pollution injuriously affecting such private property rights in tidal navigable salt waters and the beds thereof, and for a pollution so affecting private property rights in small non-navigable streams.

Now it is undoubtedly true that the private rights of ownership which may be acquired and held in tidal navigable waters and the beds thereof, must be acquired from the Commonwealth and must be held subject to such regulations as it may prescribe for the protection of the public interest. It is also true, as said in *Hampton* v. *Watson,* 119 Va. at pages 98-9, 89 S. E. at pages 81, 82 (L. R. A. 1916 F, 189) ;" * * * the tidal navigable salt waters and the beds thereof belong to the Commonwealth, in a sovereign capacity, for the benefit of all the public and cannot be disposed of to the detriment of the public interest." Citing a number of authorities. But who is to decide whether a disposition of such subject in any particular instance is in detriment of the public interest, and what interest has the public in the subject? These are different questions, which will be hereinafter considered.

And it is unquestionably true that in the absence of such exclusive private property rights, acquired from the Commonwealth, the pollution of such waters and the beds thereof by sewerage discharged therein or thereon by private persons, corporations or municipalities, whether under legislative authority or without, cannot create a common law nuisance, so long as only such waters and bed thereof are affected, since the rights of riparian owners in such case would not be affected. But, as is also said in the opinion of the court in the case last cited, referring to the holding in *Illinois Central R. Co.* v. *Illinois,* 146 U. S. 387, 13 Sup. St. 110, 36 L. Ed. 1018, such sovereign ownership in the Commonwealth is held," * * * with the consequent right to use *or dispose of* any portion thereof when that can be

done without substantial impairment of the interest of the public in the waters." (Italics supplied.)

Now it is settled beyond all controversy that exclusive private rights of ownership in such waters and in the beds thereof, consisting of exclusive rights of fishery, namely, of shell fishery (being the precise rights which were acquired by appellant in the instant case from the Commonwealth), may be acquired from the Commonwealth, and that such disposition of a portion of the sovereign ownership by the latter is not such an impairment of the interest of the public in the waters and beds thereof aforesaid as to prevent such disposition being valid and effectual to vest in private persons such property rights. 2 Farnham on Waters, sections 370, 402.

As said by the latter learned author in said section 370 above cited: *"Rights of legislature to grant exclusive rights in tidal water.* When the American colonies separated from the mother country and acquired their freedom, they acquired all the powers, not only of the Crown, but of Parliament also, and, unless restricted by the Constitution, this power resides in the legislatures. Parliament, in England, always had the right to grant exclusive fishery rights in tidal waters. *Queen* v. *Robertson,* 6 Con. S. C. 52. And that power rests in the legislatures, except where it is withdrawn from them by the Constitutions. *Commonwealth* v. *Weatherhead,* 110 Mass. 175; *Rowe* v. *Smith,* 48 Conn. 444; *Chalker* v. *Dickinson,* 1 Conn. 382, 6 Am. Dec. 250; *Martin* v. *Waddell,* 16 Pet. 367, 369, 10 L. Ed. 997, 998; *Den ex dem-Russell* v. *Jersey Co.,* 15 How. 432, 14 L. Ed. 760; *Wooley* v. *Campbell,* 37 N. J. L. 163; *Carter* v. *Tinicum Fishing Co.,* 77 Pa. 310; *Shreves* v. *Liveson,* 2 N. J. L. 247; *Munson* v. *Baldwin,* 7 Conn. 168; *Walker* v. *Stone,* 17 Wash. 578, 50 Pac. 488; *Halleck* v. *Davis,* 22 Wash. 393, 60 Pac. 1116; *Commonwealth* v. *Hilton,* 174 Mass. 29, 54 N. E. 362, 45 L. R. A. 475. And when grants to private individuals

have been made, they are valid and will be upheld; so that there may be a several fishery in a tidal water. *Fitzgerald* v. *Faunce,* 46 N. J. L. 536; *Den ex dem. Bispham* v. *Rice,* cited in *Gough* v. *Bell,* 22 N. J. L. 463." As stated in note 2 to such section: "Public fisheries may be leased and disposed of by the legislature in any manner so that it does not interfere with or impair the public right of navigation or the power of the general government to regulate commerce and navigation in bays and harbors. *Gough* v. *Bell,* 21 N. J. L. 156."

In section 402 above cited, the same learned author last quoted says: *"Public right in shell fisheries * * * This right is subject to *. * * .grants* from the public which has placed the title to the beds in private ownership. *Peck* v. *Lockwood,* 5 Day (Conn.) 22; *Martin* v. *Waddell,* 16 Pet. 367, 10 L. Ed. 997; *Parker* v. *Cutler Mill Dam Co.,* 20 Me. 353, 37 Am. Dec. 56; *Bagott* v. *Orr,* 2 Bos. & P. 472; *Paul* v. *Hazelton,* 37 N. J. L. 106; *Moulton* v. *Libbey,* 37 Me. 472, 59 Am. Dec. 57; *Weston* v. *Sampson,* 8 Cush. (Mass.) 347, 54 Am. Dec. 764; *Proctor* v. *Wells,* 103 Mass. 216 * * * The shell fisheries may be granted to private individuals so as to exclude public right of fishing there. *Commonwealth* v. *Manimon,* 136 Mass. 456."

And on principle this must necessarily be so with us. For the sovereign power of the legislature is unlimited save only as it may be limited by the State Constitution or by the grant of powers to the Federal government resulting from the Federal Constitution; and when neither State nor Federal Constitution contains any provision limiting the legislative power to grant a private right of fishery (such as held by the appellant in the case before us under grant [lease] from the legislature), in tidal navigable salt waters and the beds thereof, for the courts to say that such legislative power is limited by a rule that the private right so granted shall not interfere with the public use of such

4

waters and beds thereof for the discharge of sewerage, is for the judicial branch of the government to usurp the function of the Constitution (State and Federal) and to attempt to impose a limitation upon the sovereign power of the legislature. The bare statement of the proposition is sufficient to refute the contention that such a limitation upon the legislative power exists with us or can be imposed by the courts.

In England, the Crown had not the same plenitude of power to grant exclusive private rights of fishery in tidal navigable salt waters and beds thereof, at least not after Magna Charta, so as to interfere with the public use of such waters and beds thereof, but it would serve no useful purpose to attempt here the difficult task of delving into ancient rules of the common law which hedged about the power of the Crown when attempted to be exercised without the consent of Parliament in matters affecting the *jus publicum,* since the power of our legislature is not measured by the power of the Crown in England. It should be noted, however, that in the consideration of this subject it must be constantly borne in mind that much which is found in the books (of text-writers and of decisions) with respect to the inalienable nature of the *jus publicum* has its origin in the common law doctrine touching the limitations above alluded to upon the power of the Crown and has no correct application to the legislative power in the premises.

In truth, aside from the public right of navigation, which falls within the control of the Federal government as a result of the grant of powers to the latter by our Federal Constitution, there is no *jus publicum,* or public right, or public interest in tidal navigable salt waters or the beds thereof, except such right or interest as the public is permitted to enjoy by legislative sufferance or legislative grant. And this is true of municipalities, other corporations, public or private, and of private persons composing the public. They

have no vested rights in the premises which the legislature cannot take away. Such rights are subject at all times to the control of the legislature, since we have no constitutional limitation on the subject as aforesaid. 2 Farnham on Waters, section 370, page 1375.

All rights claimed by municipalities, and by all other persons, corporate or individual, to use such waters or beds thereof for any purpose must be derived from the Commonwealth, by sufferance or by legislative grant. They can have no other source of origin. As to origin, they differ not at all from all titles and rights of ownership and of use of lands above tidewater. The private right or title to all such things is derivative from one and the same source alone—the Commonwealth. (See *McCready* v. *Commonwealth*, 94 U. S. 391, *supra*, 24 L. Ed. at page 249, for reference to this principle if reference be needed.)

If, therefore (as in the case before us), the Commonwealth acting through the legislature, makes a grant (or lease) of an exclusive private right of fishery in tidal navigable waters and beds thereof to an individual (the appellant), that is but an exercise of the sovereign power of the. Commonwealth to do what it may will with its own—no constitutional limitation existing forbidding it so to do, by that grant (or lease) the Commonwealth takes away from other individuals and corporations (municipal and others), the privilege they may have theretofore enjoyed of using such waters and beds thereof by sufferance of the Commonwealth. They had no vested right in such use. It was a privilege merely, just as soil above tidewater belonging to the Commonwealth may be used in common by all or any of its citizens, until there is a private grant thereof from the Commonwealth. Upon such privte grant issuing in pursuance of legislative enactment, the public use in common must cease.

The foregoing assumes, of course, that the private grant

(or lease) of exclusive right of fishery to the individual instanced is a *prior* grant (or lease)—as in the case before us. In such case if another (a municipal corporation, such as the appellee, for instance) were (since the Constitution of Virginia of 1902 went into effect) to invade such private right of fishery under express legislative authority, such authority would be null and void under section 58 of Constitution of Virginia, 1902, forbidding the legislature to authorize the taking or damaging of private property for public use without just compensation.

Section 1338 of the Code of Virginia is declaratory of the common law rights of sovereignty of the Commonwealth of Virginia aforesaid pertaining to this subject and specifically refers to its rights "by special grant" to withdraw from the use "in common by all the people of the State" portions of "the beds of the bays * * * and shores of the sea within the jurisdiction of this Commonwealth" and to vest exclusive rights of property in such portions thereof in private persons, except that any grant of such exclusive private property rights was forbidden to be issued after such statute went into effect "in any natural oyster bed, rock or shoal, whether the said bed, rock or shoal shall ebb bare or not." *Taylor* v. *Commonwealth,* 102 Va. 759, 47 S. E. 875, 102 Am. St. Rep. 865. The exception contained in such statute is merely a declaration of legislative policy by way of a self-imposed limitation of the sovereign right of the Commonwealth to "grant" and "pass any estate or interest of the Commonwealth" in such natural oyster beds, rock or shoal, in tidal navigable waters. (The rights of fishery held by appellant do not include "any natural oyster bed, rock or shoal.") Accordingly the power of the legislature of Virginia to authorize by statute the leasing to private persons of oyster grounds beneath the navigable tidal waters within its jurisdiction has been uniformly recognized by the decisions of this court. And it has been uniformly held

that such leases confer an "exclusive right (upon) the lessee to use and occupy the land "for the period of the lease. As said by this court in *Power & Kellogg* v. *Tazewells,* 25 Gratt. (66 Va.) 786, speaking of such a lease: "It confers in fact an exclusive right to use, occupy or take the profits of the land by planting or sowing oysters upon it * * *." Such a private right of property is vested by such a lease in the lessee in the bed of the ground beneath the waters that the lessee (occupying the precise position as that occupied by the appellant) may maintain an action of unlawful detainer to recover the possession thereof. See to the same effect, *Hurst* v. *Dulany,* 84 Va. 701, 5 S. E. 802; *Mears & Lewis* v. *Dexter,* 86 Va. 834, 11 S. E. 538. Such a grant of exclusive private property right is not in violation of the power of the Congress to regulate commerce under the Federal Constitution, and such a grant confers a property right. *McCready* v. *Commonwealth,* 94 U. S. 391, 24 L. Ed. 248. The existence of such property rights is also recognized by statute in Virginia. Section 2137a, Code of Virginia, provides that: "the interest in said planting grounds shall be construed to be a chattel real and shall at the death of the renter pass into the hands of the personal representative for the benefit of creditors and the heirs of the decedents."

Therefore, as against the private property rights of appellant, acquired in pursuance of statute of the Commonwealth of Virginia, the acts of the appellee complained of created what would have been at common law a private nuisance if created by a private person, and for which the appellee is liable to appellant in damages to the extent of making the "just compensation" required by section 58 of the Constitution of 1902 of Virginia. *Huffmire* v. *Brooklyn,* 162 N. Y. 584, 57 N. E. 176, 48 L. R. A. 421. As said in the latter case:

"The plaintiffs contend that the casting of noxious and

destructive substances upon their oyster bed was not a consequential but a direct injury. The defendant insists that the discharge of the sewer in question into the waters of Mill creek is simply the consequential result of obedience to the legislative mandate, and that, in the absence of negligence on the part of the municipal authorities in the construction and operation of said sewer, the defendant is not liable. Applying the rule which the defendant invokes in all its force and breadth, we think this case falls directly within the constitutional inhibition against the taking of property without compensation. The plaintiffs were lawfully in possession of a piece of land under water upon which they had planted a bed of oysters. They had their title under legislative authority, which was as ample and unquestioned as that under which defendant's sewer was constructed. Although this land was under public waters, it was as much the private property of the plaintiffs as though it had been a tract of farm land held under a lease from the town of Flatlands under legislative authority. The act of the defendant in pouring its sewage upon this land was not consequential. It was as direct as though it had been discharged upon a piece of land owned or rented by the plaintiffs, and used for farming or gardening purposes. In the latter case a municipal corporation could not successfully defend its trespass because it was acting under legislative authority, or because its sewage had been carried to the lands of the person complaining over the lands of others. The fact that plaintiffs' land was under public water, and that defendant's sewage was discharged upon it, after passing through 500 feet of public water, the land under which was not in possession or control of the plaintiffs, does not differentiate this case in principle from the illustrative case of a discharge of sewage upon surface lands. In either case the injury is so direct as to amount to an invasion of a private right, which no legislative sanc-

tion or direction can justify or excuse. These views are, we think, sustained by abundant authority."

The Constitution of the State of New York contains no provision requiring compensation to be paid for private property "damaged" for the public use, such as the Constitution of Virginia, 1902, section 58, but only such a provision as to the "taking" of private property. But under the view taken by the New York courts of the subject (also taken in Massachusetts, and in a few other jurisdictions) a physical invasion of private property as the result of public use is held to be a "taking" within that constitutional provision. It is true that in Virginia, prior to its Constitution of 1902, a stricter rule obtained and nothing short of an actual "taking" of private property for public use was held to come within the former constitutional provision in this State on the subject, which, like the New York constitution, required compensation to be made only for a "taking" of private property for public use. Hence, indeed, the amendment of our Constitution in 1902, adding in section 58 thereof the words "or damaged." Debates Constitution Convention, 1901-2 p. 697 *et seq.*

Therefore, the case of *Huffmire* v. *Brooklyn, supra,* is directly in point as to what the holding in this case before us should be under our present Constitution.

The appellee relies upon the cases of *Hampton* v. *Watson, supra; Seaman* v. *New York,* 176 App. Div. 608, 161 N. Y. Supp. 1002; *Sayre* v. *Newark,* 60 N. J. Eq. 361, 45 Atl. 985, 48 L. R. A. 722, 78 Am. St. Rep. 629; *Doremus* v. *Paterson,* 65 N. J. Eq. 711, 55 Atl. 304; *Merrifield* v. *City of Worchester,* 110 Mass. 216, 14 Am. Rep. 592; *Haskel* v. *New Bedford,* 108 Mass. 208-214; *Gray* v. *Paterson,* 60 N. J. Eq. 385, 45 Atl. 995, 48 L. R. A. 717, 83 Am. St. Rep. 642. But in these cases either there did not exist in the plaintiff any property right acquired from the Commonwealth, or if it did, it was not "taken" or "damaged" by the acts complained of, within the meaning of the constitutional provision on the subject.

In the *Hampton* v. *Watson* case, *supra*, it is true that the opinion of this court rested the decision upon the ground that "the beds and waters of Hampton creek * * * (in question in that case) * * * being tidal, navigable salt waters, are held in trust by the State of Virginia for the public and cannot be granted to an individual so as to impair the public interest therein, or the use thereof."

But the public use of such beds and waters which the court had in mind and of which it was speaking in that case was a use which long prior to the institution of plaintiff's action in 1915 had taken actual possession of such beds and waters as a dumping ground for the discharge of sewerage to the extent of completely polluting the ground of plaintiff so that it was unfit for his purposes before his action was instituted. The facts in that case were that long prior to the institution of the plaintiff's action in 1915, to-wit, in 1899-1900, the city of Hampton constructed its sewer system and put it in operation, discharging into Hampton creek, and in 1908 made additions thereto and put same in operation having the same place of discharge. And this was not all. From a time prior to 1908 there were private sewer systems emptying into the same place established by the county poor house, the National Soldiers' Home with over three thousand inmates, the Normal School, with eleven hundred inmates, and other private sewers and closets, which were not connected with any sewer of the defendant city and which continuously drained and emptied directly into Hampton creek. And, as said in said opinion: "The evidence shows that the sewerage from these private sources is many times more than sufficient to pollute the waters in question, so as to forbid the sale of oysters directly therefrom." As also stated in such opinion: "It further appears that in the summer of 1909, the oyster planters in Hampton creek were notified by the health officer of the county that those waters were too polluted to

permit the sale of oysters therefrom, and again in 1914, the United States health authorities made an examination and found that the waters were too polluted for oysters to be sold directly therefrom, and thereupon the Pure Food and Dairy Department of the State of Virginia notified the defendant in error, among others, that it would not be permitted to sell their oysters without first transplanting them to unpolluted waters."

In that case the plaintiff's right to maintain his action necessarily depended upon his having had an exclusive private right of ownership—an exclusive private right of fishery—in the tidal waters and bed thereof in question as of the time his alleged cause of action arose. Plainly under the facts of that case he did not have such exclusive private property right at the time his alleged cause of action arose, since the city of Hampton, by its sewer system established and begun in operation in 1899-1900 and enlarged in 1908, certainly by 1914 (five years having expired after the injury therefrom began), had acquired a statutory right to discharge its sewerage in the locality in question. *Virginia Hot Springs Co.* v. *McCray,* 106 Va. 461, 56 S. E. 216, 10 L. R. A. (N. S.) 465, 10 Ann. Cas. 179; *Southern Ry. Co.* v. *McMenamin,* 113 Va. 121, 75 S. E. 980; *Magruder* v. *Virginia Carolina Chemical Co.,* 120 Va. 352, 91 S. E. 121. The *Hampton* v. *Watson* case, therefore, presented the question whether a plaintiff claiming an exclusive private right of fishery under grant (lease) from the Commonwealth which he had lost, by reason of the bar of the statute of limitations, before he instituted his action, because of public use in conflict with such private right, could yet maintain his action. That was a very different question from the one presented in the instant case, where the appellant held and owned at the time his alleged cause of action arose an exclusive private right of fishery under grant (lease) from the Commonwealth which he had not lost before he instituted his action.

What is said, therefore, in the *Hampton* v. *Watson* case should be construed in the light of the facts of that case.

Moreover, as said in *Williams Printing Co.* v. *Saunders,* 113 Va. 156, at p. 179, 73 S. E. 472, at p. 478 (Ann. Cas. 1916 E. 693) :" * * * the value of a case as a precedent is affected by the consideration that the precise point for which it is relied upon as authority was presented in argument and considered by the court." It seems that in the *Hampton* v. *Watson* case the point was not presented in argument that by the provision of section 58 of the Constitution of Virginia of 1902, the authority of the legislature to authorize a municipality to *damage* private property for public use without just compensation was taken away, so that the *damnum absque injuria* rule applied by the court in that case should not have been applied. Certainly, that point was not considered by the court, as appears from the opinion. Therefore, for this reason also, the *Hampton* v. *Watson* case should not be considered as decisive of the instant case. But if that case can be construed to apply to the instant case, it can only be upon the ground that it holds that an exclusive private right of fishery cannot be granted by the Commonwealth. Such a holding would be unsound because in conflict with the principle of law involved and the settled law on the subject, as above noted. Hence, I am of opinion that the *Hampton* v. *Watson* case cannot properly rule the instant case.

In *Seaman* v. *New York, supra,* the plaintiff had no property right which he had acquired of the Commonwealth in the tidal water in question, nor in the bed thereof.

In *Sayre* v. *Newark, supra,* there was no private property right in the bed of the stream acquired from the Commonwealth nor was there any "taking" of the property right in question. It was merely a riparian property right which was "damaged." The Constitution of New Jersey contains no provision against private property being "damaged" for

public use without just compensation, but only such provision as to a "taking" of private property for public use. In New Jersey the construction of the latter provision by its courts is the same as the Virginia doctrine on that subject before our Constitution of 1902. Hence that case is not authority in point on the question under consideration under the latter Constitution.

In *Doremus* v. *Paterson, supra,* the stream affected by the pollution was above tidewater, and the plaintiff had acquired no property right in the water in question.

In *Merrifield* v. *City of Worcester, supra,* the property right affected was a riparian right only, not a right in the bed of the stream. The court remarked that it was not an "acquired property right in possession." However, that case is to some extent distinguished by a holding of the court somewhat peculiar to Massachusetts (1 Furnham on Waters, sec. 138-c) ; and, further, it rests upon an application of the doctrine of *damnum absque injuria* which has not been sanctioned in Virginia. *Arminius Chem. Co.* v. *Landrum,* 113 Va. 7, 73 S. E. 459, 38 L. R. A. (N. S.) 272, Ann. Cas. 1913 D. 1075.

In *Haskell* v. *Bedford, supra,* among the plaintiff's property rights was one which he had acquired from the Commonwealth, and that was a title to the channel of the river underneath tidewater, by virtue of a certain statute of the State of Massachusetts. As to that right the court in its opinion says: "But the right conferred upon the city of New Bedford to lay out common sewers 'through any streets or private lands' does not include the right to create a nuisance, public or private, upon the property of the Commonwealth, or of an individual, within tidewater. *Hale de Mortibus Maris,* c. 7, in Hargr. Law Tracts, 85; *Boston* v. *Richardson,* 19 How. 263, 270, 15 L. Ed. 639, and 24 How. 188, 193, 16 L. Ed. 625; *Proprietors of Docks & Canals* v. *Lowell,* 7 Gray (Mass.) 223; *Sherman* v. *Tobey,* 3 Allen

(Mass.) 7; *Attorney-General* v. *Birmingham,* 4 Kay & Johns, 528; *Attorney-General* v. *Leeds,* Law Rep., 5 Ch. 583." And the court held that the city, notwithstanding its legislative authority to establish its sewers as it did, discharging into the bed of the channel of the said river, was liable in damages to the plaintiff for the injury done him by the accumulation of sewerage in such river bed below tidewater, and filling it up, that being a private nuisance, and reversed the court below on this point for holding to the contrary. See pp. 214, 215 and 216 of the report of that case in 108 Mass. Indeed the court in that case went farther and held that, "Against the continuance of such a nuisance, if clearly proved, equity will also grant relief by injunction," citing a number of cases. See 108 Mass. p. 216.

In *Grey* v. *Paterson, supra,* the plaintiffs at whose relation the suit was brought were riparian owners, and those whose lands bordered on the river at tidewater had acquired no property right in the tidal waters or beds thereof, such right still remained in the Commonwealth.

There is nothing in the cases of *Taylor* v. *Commonwealth,* 102 Va. 768, 47 S. E. 875, 102 Am. St. Rep. 865; *N. N. S. B. & D. D. Co.* v. *Jones,* 105 Va. 503, 54 S. E. 314, 6 L. R. A. (N. S.) 247; *Ill. Cent. R. Co.* v. *Illinois,* 146 U. S. 387, 13 Sup. Ct. 110, 36 L. Ed. 1018, or *Coxe* v. *State,* 144 N. Y. 396, 39 N. E. 400, cited in the opinion of this court in *Hampton* v. *Watson, supra,* which is in any way in conflict with the holding in the case of *Huffmire* v. *Brooklyn, supra.*

It is true that in the opinion in the case of *Coxe* v. *State* just mentioned, there is a distinction sought to be made between the character of the title vested in the Commonwealth with respect to tidal navigable waters and the beds thereof and the character of such title with respect to land above tidewater. But for the reasons indicated above, both on principle and upon authority, such a distinction cannot be

sound.   The opinion confuses the character of title vested
in the Crown in England with that vested in our American
Commonwealths and attributes to the latter limitations
which in truth have and can have no existence unless im-
posed by Constitution, State or Federal.   A detailed discus-
sion of the authorities referred to in such case would make
this even more manifest, but that would needlessly prolong
this opinion, since what is said in *Coxe* v. *State* on the sub-
ject under consideration does not contravene the power of
the legislature to grant an exclusive private right of fishery
which does not interfere with the powers vested in the Fed-
eral government under the Federal Constitution to control
navigation and regulate commerce.   Such a grant even
under the position taken in that case would be considered
a reasonable exercise by the State of its legislative power
and valid to vest exclusive private right of fishery, and
hence such case is not in conflict with the case of *Huffmire*
v. *Brooklyn, supra.*

What the case of *Coxe* v. *State, supra,* decided was that
a legislative grant to a private individual or corporation to
dyke off a part of the tidal navigable salt waters and fill
in so as to reclaim the beds underneath such waters was
void because in conflict with the Federal Constitution grant-
ing to the Federal government the exclusive power to regu-
late foreign and domestic commerce.   There is nothing in
that holding in conflict with either the *Huffmire* v. *Brook-
lyn* case or what has been said above on the fundamental
principle involved.

That case also rests its decision on the ground that the
act of the legislature in question was void under the New
York State Constitution because it embraced more than
one subject; but that ground is, of course, foreign to the
subject we have under consideration and is merely referred
to as further showing that the court did not rest its decis-
ion of the case upon the distinction sought to be made in

its opinion as aforesaid with respect to the character of title vested in the Comonwealth to tidal navigable waters and the beds thereof.

There is nothing in the cases of *Scranton* v. *Wheeler, Greenleaf Johnson Lumber Co.* v. *Garrison, Willink* v. *United States,* or *State* v. *Cleveland,* cited in the majority opinion, in conflict with what has been said above. These cases concern the power of the Federal government under the Federal Constitution. They hold, in effect, that no private property right in navigable waters and the beds thereof can be acquired or held as against the power of the Federal government to control navigation and regulate commerce, conferred upon the latter by the Federal Constitution.

I have no difference with the majority opinion on the subject that, as stated in such opinion, "Grants in derogation of the common or public right are always strictly construed against the grantee. Nothing passes except what is specifically granted, or by necessary implication." *Illinois R. Co.* v. *Illinois,* 146 U. S. 469, 13 Sup. Ct. 110, 36 L. Ed. 1048, cited in the majority opinion, and numerous other authorities which might be cited, so holding in effect. But after giving full force and effect to this rule, as we have seen from a consideration of the Virginia statute law on the subject, such statute law is free from all ambiguity and all uncertainty, and plainly and unquestionably has made the grant to the appellant of the exclusive rights of fishery aforesaid, in the locality aforesaid, "for the purpose of planting and propagating oysters thereon." And such grant was accepted by the appellant and he entered into the possession thereof before the appellee acquired any rights under the legislative grant of authority to it as a municipality to construct its new sewerage system and to discharge its sewerage therefrom, complained of by appellant. The circumstance that the fee simple was not granted to the appellant seems to me to be wholly immaterial. Other

property rights are just as sacred, may be of the same value and are just as much entitled to protection as are the simple interests in property. The point is that exclusive private property rights were "specifically" granted to and derived by the appellant under legislative enactments of the Commonwealth of Virginia; and such rights were so acquired by the appellant before any conflicting rights were acquired by the appellee under its legislative authority. The new sewer and the discharge of sewerage therefrom complained of by appellant, was not begun by appellee until 1907, after the Constitution of Virginia of 1902 went into effect. If prior to such Constitution the appellee had any legislative authority to discharge its sewerage to the damage of said private rights of appellant without liability to him in damages, such authority was annulled by the provision of such Constitution (sec. 58) above referred to. *Swift & Co.* v. *Newport News, supra,* 105 Va. 108, 52 S. E. 821, 3 L. R. A. (N. S.) 404, and other authorities cited above on this subject. Hence in 1907 and thereafter, when the appellee committed the acts complained of, creating what would be a private nuisance if created by an individual, the appellant's private property rights aforesaid were protected by such constitutional provisions, and the legislative authority relied on by appellee could furnish no warrant to damage such property rights as aforesaid, and no shield to it from liability for damages therefor. The majority opinion refers to certain authorities on the subject of the rights of riparian owners of real estate bordering upon navigable waters. I have no difference with those authorities. The rights of such riparian owners exist at common law and under statute. Such rights are well settled by the authorities, and it is firmly established that such rights, unless derived from legislative authority, never extend beyond the low water mark into navigable tidal salt waters, or upon the beds thereof. The right to build wharves extending beyond

the low water mark of navigable tidal salt waters must be derived from legislative grant. *Taylor* v. *Commonwealth,* 102 Va. 759, 47 S. E. 875, 102 Am. St. Rep. 865; *Newport News S. Co.* v. *Jones,* 105 Va. 503, 509, 54 S. E. 314, 6 L. R. A. (N. S.) 247. Hence, the alleged right of a municipality, relied on by appellee in the instant case, to discharge its sewerage into the waters aforesaid and upon the beds thereof are not the rights of a riparian owner, and the authorities referred to in the majority opinion on this subject have no bearing in principle or controlling application to the instant case, as I must say, with all due deference.

My view is that the right of the appellee on which it relies in this case can be nowhere found unless under its legislative authority; and, as above stated, it cannot be found under that authority.

The remaining authorities cited in the majority opinion, not referred to above, of note to case of *Winchell* v. *Waukesha,* 84 Am. St. Rep. 921-3, and 9 R. C. L. 682, confirm the correctness of the conclusion of this dissenting opinion. There is nothing in the act of assembly of 1908, p. 624, referred to in the majority opinion, to the contrary. Indeed, the latter act expressly provides that the municipality shall "acquire" the land necessary to operate its sewers "by purchase, condemnation, or otherwise," and does not contemplate the damaging of any private property rights without due compensation.

Hence, upon principle and upon authority, I think the appellee, upon the case made by the allegations of the bill, is liable in damages to the appellant to the extent of the just compensation required to be paid by section 58 of the Constitution of Virginia, 1902.

The learned judge of the court below would have so held, as appears from the decree appealed from, but for the supposed binding authority to the contrary of the case of *Hampton* v. *Watson, supra.* For the reasons stated above.

I do not consider the latter case authority to the contrary. And if it were, I am convinced that upon principle and authority, as aforesaid, it should be overruled.

It is not intended by anything which is said above to intimate that I think an injunction should be granted in the instant case. The granting or refusal of an injunction would depend upon other considerations.

Where a municipal corporation has at great expense constructed and put in operation, and used for a long time, a system of sewerage, an injunction should be refused on the ground that it would be inequitable to give such relief, where relief can be otherwise afforded, as by making just compensation in damages. *Grey* v. *Paterson,* 60 N. J. Eq. 385, 45 Atl. 995, 48 L. R. A. 717, 83 Am. St. Rep. 642. Many other authorities might be cited to the same effect.

For the reasons stated above, I am constrained to dissent from the majority opinion.