## Richmond

### THE WORKING WATERMAN'S ASSOCIATION OF VIRGINIA, INC.

### v.

### SEAFOOD HARVESTERS, INC., ET AL.

Record No. 821800.

### COMMONWEALTH OF VIRGINIA

### v.

### SEAFOOD HARVESTERS, INC., ET AL.

Record No. 821809.

March 9, 1984.

Present: All the Justices.

*James S. Insley* for appellant. (Record No. 821800.)

*Ben A. Williams, III (Janet I. Farquharson; Vernon D. Hitchings, Jr.; Patten, Wornom & Watkins; Decker, Cardon, Weintraub, Thomas & Hitchings*, on brief), for appellees. (Record No. 821800.)

*John R. Butcher, Assistant Attorney General (Gerald L. Baliles, Attorney General; Frederick S. Fisher, Assistant Attorney General*, on brief), for appellant. (Record No. 821809.)

*Ben A. Williams, III (Janet I. Farquharson; Vernon D. Hitchings, Jr.; Patten, Wornom & Watkins; Decker, Cardon, Weintraub, Thomas & Hitchings*, on brief), for appellees. (Record No. 821809.)

COMPTON, J., delivered the opinion of the Court.

We granted this appeal to determine whether a statute regulating the method of removing hard-shell clams from subaqueous beds is unconstitutional as applied to certain private persons who use the prohibited method on beds leased from the Commonwealth.

Generally, all the beds of the bays, rivers, creeks, and the shores of the sea within the jurisdiction of the Commonwealth are the property of the State and may be used in common by all citizens for fishing and fowling and for taking oysters and other shellfish. Code § 62.1-1. Some publicly held seabeds are available for lease by way of assignment from the Marine Resources Commission for the purpose of planting and propagating oysters. Code § 28.1-109(1). All statutory provisions relating to leasing of oyster grounds apply equally to the right of the Commission to lease grounds for the purpose of planting, growing, storing, and harvesting clams. Code § 28.1-110. Oysters are found on the surface of rock or shell, but hard clams are imbedded in the bottom.

A shellfish lease under §§ 28.1-109 and -110 is a chattel real, Code § 28.1-109(12), and guarantees "the absolute right to the renter to continue to use and occupy such ground for the term of the lease," subject to certain conditions. Code § 28.1-109(15). Prior to 1980, the lease term was 20 years; leases issued since July 1, 1980 are for 10 years. § 28.1-109(12). The annual rent is $1.50 per acre per year. § 28.1-109(11). Under certain circumstances, a lease, or assignment, may be renewed for an additional term. § 28.1-109(12).

The appellees, plaintiffs below, hold valid assignments and leases of oyster and clam planting grounds. These interests were acquired during the period February 3, 1978 to May 25, 1981. Plaintiff Andrew P. Killmon holds leases for substantial acreage in Accomack County near Wachapreague. Plaintiff Seafood Harvesters, Inc., has interests in beds on the Hampton Bar in the waters of Hampton Roads adjacent to the City of Hampton. Plaintiff F. & G., Inc., t/a Seaside Oyster Company, acquired rights in

substantial acreage in the Back River adjacent to the City of Hampton. Each "Oyster Ground Assignment" issued by the Marine Resources Commission assigns ground "under the laws of Virginia made or to be made," according to the language of the document.

In Virginia, the methods used to harvest hard clams include treading, hand raking, tonging and patent tonging; also used are modified oyster dredges, and recently, under experimental permits, hydraulic escalator dredges. During the time pertinent to this litigation, the plaintiffs were employing the hydraulic escalator dredge on their leased grounds to harvest hard clams under permits issued by the Marine Resources Commission, marked "for experimental purposes."

The so-called "escalator harvester" used for hard clams is an apparatus that can be mounted on any typical Chesapeake Bay work boat. It is essentially a scoop mounted on skis that can be lowered to rest on the seabed. The scoop is pushed by the boat forward through the sea bottom, the skis regulating the fishing depth. Water sprayed from a manifold on the front of the scoop loosens the soil permitting the forward motion of the boat to funnel the shellfish through the scoop and onto a conveyor belt. The belt transfers the clams to the surface for removal and sorting by the crew.

The record shows that during a six-week period in the fall of 1980, the Virginia Institute of Marine Science (VIMS) monitored the operation of the hydraulic escalator hard clam dredge (hereinafter, hydraulic dredge) on Hampton Flats in the James River. The crew retained only littleneck and cherrystone clams, discarding the larger chowder clams. The average catch rate of retained clams was 2,888 clams per hour or 48 clams per minute. Chowder clams constituted 30 percent of the total catch.

Patent tongs are widely used in Virginia to harvest both clams and oysters. The tongs are large, steel, rake-like devices hinged as scissors. They are dropped overboard in an open position with teeth spread apart. When striking the bottom, the teeth close. With the use of a winch, they "take a bite out of the bottom" and the "whole business" is pulled to the top.

During the VIMS examination of the hydraulic dredge, the relative efficiencies of the dredge and patent tongs were tested. It was determined that the catch rate of the dredge was 7.5 times greater for littlenecks and cherrystones than that of the patent

tongs. VIMS concluded that the hydraulic dredge could capture in an hour as many clams as the patent tong could take in an eight-hour day.

During the 1980 General Assembly session, legislation was introduced to prohibit use of the hydraulic dredge to take hard-shell clams. Since 1968, there had been a limitation on use of the dredge for such purpose by virtue of a regulation adopted by the Marine Resources Commission. That regulation provided:

> "*Hydraulic Dredge*: — It shall be unlawful to take or catch hard shell clams from any leased grounds in any of the tidal waters of the Commonwealth by the use of a hydraulic dredge. The Commission will determine if it should consider applications to dredge after the Virginia Institute of Marine Science reports the results of their hard-shell clam research project to the Commission." Va. Marine Res. Comm., Reg. X, Part III(3) (1968).

The report referred to in the regulation was filed shortly after adoption of the regulation, and the Commission began issuing permits, like those issued to the plaintiffs, for the use of the dredge to take hard clams experimentally.

Between the 1980 and 1981 General Assembly sessions, the House Standing Committee on the Chesapeake and Its Tributaries studied the bill to prohibit use of the dredge. Employment of the device sparked concern about possible depletion of the resource of hard clams due to the dredge's efficiency, potential environmental damage, and adverse impact on the hard clam market that would affect the economic survival of individual watermen.

During the 1981 session, the General Assembly enacted the statute attacked in this proceeding. Effective July 1, 1981, Code § 28.1-128.01 provides:

> "It shall be unlawful for any person at any time to take and catch hard-shell clams through the use of hydraulic dredges provided, however, that the Marine Resources Commission and the Virginia Institute of Marine Science may use hydraulic dredges to take and catch hard-shell clams on an experimental basis. In no event shall a permit to take and catch hard-shell clams through the use of hydraulic dredges be issued to any other person." Acts 1981, ch. 138.

This proceeding ensued on July 8, 1981, when two of the plaintiffs joined in a declaratory judgment suit filed in the trial court seeking to enjoin enforcement of the statute and seeking a declaration that the enactment was unconstitutional. Plaintiff Killmon subsequently filed a similar action in the Circuit Court of Accomack County. That suit was transferred to the court below and consolidated with the first case. The plaintiffs, harvesters and sellers of hard-shell clams, named the Commonwealth and the Virginia Marine Resources Commission as parties defendant.

The trial court permitted the Working Waterman's Association of Virginia, Inc. to intervene as a defendant in each suit. The Association's membership is composed of individuals who earn their livelihood by working the waters of the Commonwealth, harvesting shellfish and finfish.

After an ore tenus hearing, the trial court ruled in favor of the plaintiffs. The court found, as pertinent to the issues on appeal, that the statute "has no general constitutional infirmity." But the court also found that the statutes and the regulations of the Commission "in effect at the time [plaintiffs'] leases were granted allowed certain activities on [plaintiffs'] leased grounds, including but not limited to the use of hydraulic dredges for the taking of hard-shell clams." The court further held that the statute, which was enacted after the dates of the plaintiffs' leases, "restricted this activity on the leases of the [plaintiffs] and as such that legislation constituted . . . an unconstitutional, impermissible invasion of or change in the private property rights and constitutional rights of the [plaintiffs] under [their] leases with the Commonwealth." Consequently, the trial court permanently restrained the Commission from enforcing the statute against the plaintiffs on the oyster and clam grounds leased by the plaintiffs under leases in effect prior to the effective date of the statute.

The Waterman's Association and the Commonwealth appealed separately from the July 1982 final decrees; the Commission has not appealed.

The Waterman's Association and the Commonwealth (hereinafter, collectively the Commonwealth) contend, first, the trial court erred in ruling that the statutes and Commission regulations in effect at the time plaintiffs' leases were granted permitted use of hydraulic dredges for the taking of hard clams. The Commonwealth points out that, under Code § 28.1-112(7), a transferred lease constitutes a new lease. It notes that all of the leases in ques-

tion were issued or transferred after the effective date of the prohibition in the 1968 Commission regulation. Thus, the argument goes, because the regulation prohibited use of the dredge for taking hard clams from leased bottoms at the time the plaintiffs received their leases, the subsequent issuance of short-term experimental permits did not remove the general prohibition.

Responding, the plaintiffs contend that the regulation was no longer a prohibition against the use of a dredge when they acquired their leases. They argue that because the VIMS report referred to in the regulation had been received, and the Commission subsequently acted upon applications and issued permits to private persons, including the plaintiffs, the bar of the regulation had been removed. Additionally, the plaintiffs contend that the term "experimental" was an unauthorized classification placed on the permits by the staff member issuing the permits. They say that because there is no evidence that the Commission authorized such a designation, the permits actually were issued for unrestricted dredging on private grounds pursuant to Code § 28.1-134. Generally, that statute authorizes dredging or scraping by any person holding oyster-planting ground under legal assignment, provided he obtains a permit from the Commission for each boat used.

In order to address the important constitutional issue in this appeal, we will agree with the plaintiffs and assume without deciding that the trial court correctly determined that the statutes and regulations in effect at the time plaintiffs' leases were granted permitted use of hydraulic dredges for the taking of hard clams. The Commonwealth argues, however, that even if the statute in question imposed some new restrictions on the plaintiffs' ability to use the hydraulic dredge, the statute is a constitutional exercise of the State's police power.

The plaintiffs disagree and contend the trial court correctly held that Code § 28.1-128.01 was an unconstitutional and impermissible invasion of their personal property rights. Plaintiffs point out they held validly issued leases for the clam and oyster grounds at the time the statute was enacted, the leases were valid for 20 years according to Code § 28.1-109, the leases constitute private property and chattels real "as they are alienable, descendable, renewable and of a definite term and further constitute a valuable means of livelihood." They contend that all of the provisions of Code § 28.1-109 constitute the terms of the leases and are thus binding on the Commonwealth and the lessees. They argue that

the language on the face of the leases which states that the lease is subject to "the laws of the Commonwealth made or to be made" is superfluous as there is no authority in the statute for such language.

In sum, they emphasize the "very positive" wording of § 28.1-109 whereby the State guarantees "the *absolute* right of the renter to continue to use and occupy" the ground leased thereunder for the term of the lease. The plaintiffs contend "that the lease in question constituted a valid contract between the Commonwealth as landlord and the clammers as tenants for the use of this bottom land as private clam and oyster ground." According to the plaintiffs, the State "substantially altered the terms of this contract when it enacted Sec. 28.1-128.01 by attempting to forbid the use of the hydraulic dredge for harvesting hard clams on said private grounds, such use having been previously allowed." They state that the attempted exercise of the police power here was invalid because restrictions were imposed on the use of private property that were unnecessary and unreasonable. Plaintiffs assert that the statute in question, which prevents use of a highly efficient dredge, was enacted solely to satisfy the watermen rather than to exercise the police power for the welfare of the general public.

Thus, we see that the arguments of the respective parties focus on the interrelationship between preservation of the obligations of contracts and exercise of the State's police power. "The contract clauses of the Federal Constitution and the Virginia Bill of Rights protect against the same fundamental invasion of rights." 1 A. Howard, Commentaries on the Constitution of Virginia 203 (1974). The General Assembly "shall not pass any law impairing the obligation of contracts." Va. Const. art. I, § 11. *See* U.S. Const. art I, § 10 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts.") The Virginia contract clause has been interpreted by this Court in a manner similar to the treatment of the federal clause by the United States Supreme Court. A. Howard at 207.

■ Even though the language of the contract clause is unambiguous and appears absolute, it is not "the Draconian provision that its words might seem to imply." *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234, 240 (1978). The proscription against enacting statutes that impair the obligation of contracts does not prevent the State from exercising power that is vested in it for the common good, even though contracts previously formed may be

affected thereby. " 'This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.' " *Id.* at 241 (quoting *Manigault* v. *Springs*, 199 U.S. 473, 480 (1905)). The contract clause "does not operate to obliterate the [State's] police power." 438 U.S. at 241. And, as Mr. Justice Holmes wrote in *Hudson County Water Co.* v. *McCarter*, 209 U.S. 349, 357 (1908): "One whose rights . . . are subject to state restrictions, cannot remove them from the power of the State by making a contract about them."

But the contract clause does impose *some* limits upon the State's power "to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. at 242. For example, in a case like this concerning modification of a contract to which the State itself was a party, the Supreme Court stated that "[l]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 22 (1977). *See id.* at 25; *Citizens Mutual Building Ass'n* v. *Edwards*, 167 Va. 399, 410-11, 189 S.E. 453, 458 (1937).

█ Against this background, we turn to the circumstances of the present case, aware of the established law governing our determination of the constitutionality of an act of the General Assembly. Every act of the legislature is presumed to be constitutional, and the Constitution is to be given a liberal construction so as to sustain the enactment in question, if practicable. *Bosang* v. *Iron Belt Building & Loan Ass'n*, 96 Va. 119, 123, 30 S.E. 440, 441 (1898).

The first step in this analysis is to examine the precise terms of the contract that plaintiffs contend is abridged by the statute under review. The leases in evidence have their basis in a printed, government form labelled "Oyster Ground Assignment." The ground is let "for oyster planting purposes," according to the form. The form provides space for insertion of the location of the beds, the name and address of the lessee, the amount of acreage, the amount of annual rent, and the name and signature of the State Inspector for the Marine Resources Commission.

Although not set forth in the form lease, the pertinent provisions of Code §§ 28.1-109 and -110 are to be read into the assignments as terms of the contract, binding on the Commonwealth and the lessee. *See Nuttall* v. *Lankford,* 186 Va. 532, 546, 43 S.E.2d 37, 45 (1947) (decided under prior version of § 28.1-109, Code § 3193 (1942), which, unlike present statute, provided that "the provisions of this section shall be incorporated in any lease of oyster ground"). Section 28.1-109(1) provides that the leased beds "may be occupied for the purpose of planting or propagating oysters thereon." Subsection (12) provides that the "interest in such ground shall be construed as a chattel real." Subsection (15) provides that the State "guarantee[s] the absolute right to the renter to continue to use and occupy such ground for the term of the lease," subject to the statutory provisions governing lease duration, subject to riparian rights, subject to the right of fishing in waters above the bottoms, and subject to established fishing stands. Code § 28.1-110 adapts the statutory provisions relating to the leasing of oyster grounds to the leasing of grounds for the purpose of "planting, growing, storing and harvesting clams."

Shellfish leases, which are grants in derogation of the common or public right, are strictly construed against the lessee. "Nothing passes except what is granted specifically or by necessary implication." *Darling* v. *City of Newport News,* 123 Va. 14, 18, 96 S.E. 307, 308 (1918), *aff'd.,* 249 U.S. 540 (1919). Consequently, the leases granted the "absolute right" to the lessees "to use and occupy" the ground for the term of the leases for the purpose of "planting, growing, storing and harvesting clams." This means that while any person might have taken clams from the beds before the grants, afterwards only the particular lessee could do so and all others are excluded from such activity on the grounds. These provisions mark the limit of the right under the lease. The lessee "does not take a fee simple title, nor can he use the property for any other purpose except that stated in the statute, and hence every other right theretofore in the public is preserved." 123 Va. at 19, 96 S.E. at 308.

Having fixed the contract terms, we move to the next step in the analysis: Has the statute, in fact, operated as a substantial impairment of a contractual relationship? *See Allied Structural Steel Co.* v. *Spannaus,* 438 U.S. at 244. "The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations

may end the inquiry . . . [footnote omitted]. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Id.* at 245.

This inquiry will stop here; there has been only minimal alteration of the plaintiffs' rights under the leases by enactment of the statute. As the Attorney General argues, the statute has no substantial effect on the plaintiffs' exclusive right to "use and occupy" the grounds; it has no substantial effect on the plaintiffs' exclusive right to take hard clams from the beds; it does not modify the rent, infringe the lessees' ability to devise the leases, or change any of the other rights or duties established under the leases. The statute merely has prohibited use of one method of taking hard clams. Importantly, neither the leases nor the statutes guarantee the lessees unbridled discretion in selection of the method by which hard clams may be harvested.

In summary, the leases held by the plaintiffs grant an exclusive right to take clams from the leased grounds, but not a right to use a hydraulic dredge in so doing. The enactment of § 28.1-128.01 constitutes a police power restriction on the mode by which the plaintiffs may exercise their right, but it does not affect substantially the right to harvest the shellfish or the exclusiveness of the right.

It is true, as plaintiffs contend, the evidence shows it is not economically feasible, due to soil and other conditions peculiar to the areas in question, for the clams on many of the leased grounds to be harvested without use of the hydraulic dredge. But the General Assembly's power to protect the public interest cannot be frustrated by a private desire to take profits from the public shellfish resources. "It cannot be supposed that for [$1.50] an acre . . . the State contracted, if it could, against using its legislative power." *Darling* v. *City of Newport News*, 249 U.S. 540, 543-44 (1919). In other words, "the legislature cannot bargain away the police power of a State." *Stone* v. *Mississippi*, 101 U.S. 814, 817 (1879).

Accordingly, we hold the trial court erred in ruling that Code § 28.1-128.01 is unconstitutional as applied to these plaintiffs. Therefore, the judgments below will be reversed and final judgments will be entered here dismissing the respective bills for declaratory judgment.

*Reversed and final judgment.*