PRESENT: Lemons, C.J., Mims, Powell, Kelsey, McCullough, and Chafin, JJ., and Russell, S.J.

VIRGINIA ELECTRIC AND POWER
COMPANY

OPINION BY
v. Record No. 201172                    JUSTICE TERESA M. CHAFIN
                                        JULY 15, 2021

STATE CORPORATION COMMISSION, ET AL.

FROM THE STATE CORPORATION COMMISSION

Virginia Electric and Power Company ("VEPCO") appeals from a declaratory judgment

of the State Corporation Commission ("SCC" or "Commission") in which the Commission found

that a pumped storage hydroelectric facility (or "pumped storage") generates "renewable energy"

under the former definition in Code § 56-576, and that the amended definition would not apply

to contracts executed before the amendment's effective date. VEPCO argues that the

Commission erred in its interpretation of the former definition and in refusing to apply the

amended definition prospectively from its effective date. For the reasons that follow, we

disagree and affirm the Commission's decision.

I.

Constellation NewEnergy, Inc. ("Constellation") is a competitive service provider

participating in the retail choice program of Code § 56-577(A)(5) ("Subsection (A)(5)").

Subsection (A)(5) permits individual retail customers to "purchase electric energy provided 100

percent from renewable energy" from licensed suppliers if the incumbent electric utility does not

offer the same. Code § 56-577(A)(5)(a).

In December 2019, Constellation began contracting with customers to provide electricity

from renewable energy as permitted by Subsection (A)(5). "Renewable energy" is a defined

term within the statutory scheme, as set out in Code § 56-576.  At the time Constellation entered into its contracts, renewable energy was defined as

> energy derived from sunlight, wind, falling water, biomass, sustainable or otherwise, (the definitions of which shall be liberally construed), energy from waste, landfill gas, municipal solid waste, wave motion, tides, and geothermal power, and does not include energy derived from coal, oil, natural gas, or nuclear power. Renewable energy shall also include the proportion of the thermal or electric energy from a facility that results from the co-firing of biomass.

Code § 56-576 (2019).  In contracting with its retail customers, Constellation agreed to provide "100% Renewable Electricity Supply," which was set out as being sourced from a "facility . . . that generates electricity using [wind, solar, falling water (pumped storage hydroelectric or hydroelectric) or any other resource that generates electricity that meets the definition of 'Renewable Energy' under . . . Code § 56-576] (collectively, 'Renewable Generation Facilities')."  (Brackets in original.)  The provision further specified, "Seller reserves the right to substitute supply from any other Renewable Generation Facilities without prior notice to Customer."

That same month, Constellation notified VEPCO of its Subsection (A)(5) customer enrollment, and VEPCO requested documentation confirming that Constellation would provide customers with electricity sourced "100 percent from renewable energy."  Constellation responded that it intended to supply its customers with energy sourced from wind and pumped storage hydroelectric facilities, contending that pumped storage "generates electricity from falling water," consistent with the statutory definition.[1]  Attached to its response, Constellation

---

[1] A pumped storage hydroelectric facility is "a configuration of two water reservoirs at different elevations that can generate power (discharge) as water moves down through a turbine" and then "draws power as it pumps water (recharge) to the upper reservoir."  U.S. Department of

provided copies of its wholesale contracts, including the contract with the pumped storage hydroelectric facility that took effect on February 8, 2020. On April 1, 2020, VEPCO replied that it disagreed with Constellation's position regarding pumped storage, asserting that pumped storage did not meet the statutory definition of renewable energy "except in the case of any run-of-river production that can be quantified and verified."

In the meantime, the General Assembly enacted the Virginia Clean Economy Act ("VCEA") during its 2020 session. 2020 Acts chs. 1193, 1194. As part of the VCEA, and to become effective July 1, 2020, the General Assembly amended the definition of renewable energy in Code § 56-576. The definition maintained the language referenced above, but added a new sentence: "'Renewable energy' does not include waste heat from fossil-fired facilities or electricity generated from pumped storage but includes run-of-river generation from a combined pumped-storage and run-of-river facility." Code § 56-576 (current).

On April 17, 2020, Constellation petitioned the SCC for a declaratory judgment that procuring electricity from a pumped storage hydroelectric facility qualified as renewable energy under the definition in Code § 56-576 in effect at the time, such that Constellation could rely on that electricity to meet its load requirements under the retail choice program of Subsection (A)(5). Constellation further requested a finding that the revised definition, which would become effective on July 1, 2020, "applies prospectively" and would not prohibit Constellation from relying on pumped storage "for the duration of its retail contracts." Constellation asserted that the issues raised in its petition could be decided without an evidentiary hearing and

Energy, Office of Energy Efficiency & Renewable Energy, Pumped-Storage Hydropower, https://www.energy.gov/eere/water/pumped-storage-hydropower (last visited Mar. 31, 2021).

3

requested an expedited review in order for the Commission to consider the issues before the VCEA's effective date.

VEPCO filed a notice of participation and a subsequent response to Constellation's petition. VEPCO asserted that a pumped storage hydroelectric facility did not generate renewable energy under Code § 56-576 because it was more akin to a battery that stores energy, unlike the rest of the sources in the statute which generated kinetic or potential energy. VEPCO further argued that if the Commission found that pumped storage was renewable energy under the former definition, Constellation should not be allowed to rely upon the former definition where the amendment was a valid exercise of the Commonwealth's police power.

By order on May 29, 2020, the Commission granted Constellation's petition for declaratory judgment. Applying rules of statutory interpretation, the Commission found that there was no ambiguity in the phrase "derived from . . . falling water," and that electricity generated from a pumped storage hydroelectric facility is therefore "renewable energy" because it is derived from water that falls from a higher point to a lower point. Thus, pumped storage satisfied the statutory definition of renewable energy in effect at the time Constellation executed its contracts. With respect to the amended definition, the Commission declined to find that the amendment would apply "retroactively" to Constellation's 2019 contracts where the amendment would not take effect until July 1, 2020. The Commission relied on *Bailey v. Spangler*, 289 Va. 353, 358 (2015), for the proposition that retroactivity is generally disfavored absent a manifest legislative intent to the contrary. VEPCO appealed to this Court, assigning error to both findings.

4

II.

VEPCO presents two primary arguments on appeal. First, VEPCO contends that the Commission erred in finding that a pumped storage hydroelectric facility met the definition of renewable energy under former Code § 56-576. Second, VEPCO contends that the Commission erred in refusing to find that the amended definition of renewable energy applies to Constellation's existing contracts from July 1, 2020 onward. These arguments present issues of statutory interpretation and other issues of law that are subject to de novo review. *See Virginia Marine Res. Comm'n v. Chincoteague Inn*, 287 Va. 371, 380 (2014); *Anthony v. Verizon Va., Inc.*, 288 Va. 20, 29 (2014). On review in this Court, "the SCC's statutory construction 'is entitled to the respect due judgments of a tribunal informed by experience.'" *City of Alexandria v. State Corp. Comm'n*, 296 Va. 79, 93 (2018) (quoting *Virginia Elec. & Power Co. v. State Corp. Comm'n*, 295 Va. 265, 263 (2018)).

A.

VEPCO, the Commission, and Constellation all contend that the plain language of the former definition is unambiguous but disagree as to its meaning. VEPCO argues that the language plainly excludes pumped storage from the definition, whereas the Commission and Constellation argue that the plain language squarely includes pumped storage.

"When the language of a statute is unambiguous, we are bound by the plain meaning of that language." *Virginia Elec. & Power Co.*, 295 Va. at 263. "When construing a statute, our primary objective is to ascertain and give effect to legislative intent, as expressed by the language used in the statute." *Id.* at 262-63 (quoting *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012)). In doing so, we "consider the entire statute 'to place its terms in context,'" *REVI, LLC v. Chicago Title Ins. Co.*, 290 Va. 203, 208 (2015) (quoting *Eberhardt*

5

*v. Fairfax Cnty. Emps. Ret. Sys. Bd. of Trustees*, 283 Va. 190, 194 (2012)), because it is "our duty to interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal," *id.* (quoting *Virginia Elec. and Power Co. v. Board of Cnty. Supervisors*, 226 Va. 382, 387-88 (1983)).

"Renewable energy" is one definition among many contained in Code § 56-576. These definitions are confined in application to "this chapter"—Chapter 23 of Title 56—otherwise known as the Virginia Electric Utility Regulation Act ("VEURA"). Thus, the definition of renewable energy determines the permissible sources of electricity that may be relied upon to supply the "100 percent renewable energy" required by Subsection (A)(5), which is contained in the same chapter as part of the VEURA. The language presently at issue is a phrase in the former definition of renewable energy: "derived from . . . falling water." Code § 56-576 (2019).

We disagree with VEPCO's contention that the former definition excluded pumped storage. Like the Commission, we find that the plain language of the former definition is clear and unambiguous; thus, we will give the terms their ordinary meanings. "Derived from" generally refers to a thing that comes from something else. *See* Webster's Third New International Dictionary 608 (2002) (defining "derived" as "formed or developed out of something else"). As used in the definition, renewable energy would be energy formed or developed out of the enumerated sources.

One of those sources is "falling water." Because there is no language in the statutory definition for this term prescribing that "falling water" must come from a naturally occurring source or that it cannot be a part of a closed system, it is reasonable to apply the plain meaning of water that falls from one height to another. Therefore, where water falls from a higher reservoir to a lower reservoir as part of a process that generates electricity, such as happens in a pumped

6

storage hydroelectric facility, the electric energy was derived from falling water. Under this interpretation, the resulting energy satisfied the former definition of renewable energy in Code § 56-576 (2019).

VEPCO maintains that the interpretation of the definition adopted by the Commission and applied here by this Court creates an inconsistency where falling water is set apart from the other identified sources. This, it argues, is because the other named sources point to the original natural source of energy, whereas applying "derived from . . . falling water" to pumped storage ignores the original source of energy in favor of the method of production.

However, VEPCO's position would add language to the definition that simply was not included in the statute. We "'presume that the legislature chose, with care, the specific words of the statute' and that '[t]he act of choosing carefully some words necessarily implies others are omitted with equal care.'" *Wal-Mart Stores East, LP v. State Corp. Comm'n*, 299 Va. 57, 70 (2020) (quoting *Rickman v. Commonwealth*, 294 Va. 531, 540 n.3 (2017)). Indeed, as we have observed, we regularly reject invitations to "read into [a] statute language that is not there," because of the long-established rule that "[c]ourts cannot add language to [a] statute the General Assembly has not seen fit to include." *Wakole v. Barber*, 283 Va. 488, 495-96 (2012) (quoting *Jackson v. Fidelity & Deposit Co.*, 269 Va. 303, 313 (2005)); *see also Holsapple v. Commonwealth*, 266 Va. 593, 599 (2003) (same). There are numerous substitutions or qualifying words the General Assembly could have utilized to achieve VEPCO's narrower interpretation, but it did not do so. Because such limiting words were not used, we conclude that the legislature did not intend to impose such a narrow meaning on "derived from . . . falling water" as those terms were used in the former statute.

7

We also disagree with VEPCO's contention that former Code § 56-585.2 (2016) implies that the former definition excluded pumped storage. Former Code § 56-585.2 (2016), located in the same chapter, codified a voluntary renewable portfolio standard ("RPS") program which incentivized the incorporation of renewable energy into electric energy sales portfolios. For purposes of the voluntary RPS program, "[a]s used in this section: '[r]enewable energy' shall have the same meaning ascribed to it in [Code] § 56-576;" however, "'[r]enewable energy' shall not include electricity generated from pumped storage, but shall include run-of-river generation from a combined pumped-storage and run-of-river facility." Code § 56-585.2(A) (2016).[2]

If the language of Code § 56-576 already excluded pumped storage, then the language expressly excluding pumped storage in the voluntary RPS program would be surplusage, "contrary to the settled rule in this Commonwealth that every provision in or part of a statute shall be given effect if possible." *Travelers Prop. Cas. Co. of Am. v. Ely*, 276 Va. 339, 345 (2008)). Further, as we have observed, "[w]ords in a statute should be interpreted, if possible, to avoid rendering words superfluous." *Cook v. Commonwealth*, 268 Va. 111, 114 (2004) (collecting cases). This is so because, as we have long recognized, we must assume that in enacting legislation, "the [General Assembly] did not intend to do a vain and useless thing." *Williams v. Commonwealth*, 190 Va. 280, 293 (1949). A more reasonable interpretation of the statute is that the voluntary RPS program, as an aspirational program designed to encourage adoption of renewable technologies, narrowed the type of eligible pumped storage facilities under "this section" to only those that were combined with a run-of-river facility. Code § 56-585.2 (2016).

---

[2] As part of the VCEA, the voluntary RPS program was repealed and replaced by a mandatory RPS program in Code § 56-585.5.

Lastly, we must call attention to the clearest indication that energy from pumped storage was not excluded from the former definition of renewable energy: the fact that the General Assembly changed the definition in order to expressly exclude pumped storage facilities that do not incorporate run-of-river facilities. Code § 56-576. "Legislation is presumed to effect a change in the law unless there is a clear indication that the General Assembly intended that the legislation declare or explain existing law." *Chappell v. Perkins*, 266 Va. 413, 420 (2003). Nothing in the amended language indicates that the amendment was intended to clarify the meaning of the former definition. In fact, the language used to exclude pumped storage in the amended definition was substantially similar to the exclusion language that had been in the voluntary RPS program. As a result, we must presume that the amendment was intended to change the definition of renewable energy so as to generally exclude pumped storage facilities from the definition where they had not previously been excluded.

Therefore, we find no error in the Commission's interpretation of the statute or its finding that pumped storage satisfied the former definition of renewable energy.

B.

Next, VEPCO argues that the amended definition of renewable energy should apply "prospectively" to Constellation's 2019 contracts as of the July 1, 2020 effective date and that the Commission erred in refusing this application. VEPCO misconstrues the concepts of retroactive and prospective application of statutes. In general terms, applying legislation prospectively concerns the rights and claims that arise subsequent to the legislation, whereas a retroactive application reaches back to affect rights and duties accrued prior to the legislation. VEPCO claims that it is arguing for a prospective application when it is actually arguing for an application that reaches back to impact Constellation's contracts executed prior to the statutory

9

amendment and changes a term of the contract affecting Constellation's performance. Thus, the question is not one of prospective application, but it is one of retroactivity and whether the statutory amendment to a definition that does not grant substantive rights changes the previously existing contractual obligations of the parties. In the present circumstances, and in consideration of the statutory scheme, we conclude it does not.

As noted by the Commission in its final order, statutes will not be applied retroactively absent a manifest intent to the contrary. *See, e.g.*, *City of Charlottesville v. Payne*, 299 Va. ___, ___, slip op. at 11 (April 1, 2021) ("It has long been the law of the Commonwealth that retroactive application of statutes is disfavored and that "statutes are to be construed to operate prospectively only unless a contrary intention is manifest and plain.") (quoting *Town of Culpeper v. Virginia Elec. & Power Co.*, 215 Va. 189, 194 (1974)). The Commission based its decision on *Bailey v. Spangler*, 289 Va. 353, 358-59 (2015). In *Bailey*, this Court addressed a certified question as to whether a statutory presumption regarding mine void ownership applied to deeds executed before the statute was enacted in 1981. *See id*. at 355. Responding in the negative, this Court reiterated that "Virginia law does not favor retroactive application of statutes;" instead, "we interpret statutes to apply prospectively 'unless a contrary legislative intent is manifest.'" *Id.* at 358-59 (quoting *Board of Supervisors v. Windmill Meadows*, 287 Va. 170, 180 (2014)).

This rule is "somewhat relaxed" in cases of remedial or procedural statutes, but this is not the case where "contract rights are involved." *Gloucester Realty Corp. v. Guthrie*, 182 Va. 869, 873 (1944). "[R]ights accrued . . . under the former law . . . before the passage of an amended statute will not be affected by [the amendment], but will be governed by the original statute, unless a contrary intention is expressed in the later statute." *Id.* (quoting *Ferguson v. Ferguson*, 169 Va. 77, 87 (1937)). Stated otherwise, "new legislation will ordinarily not be construed to

10

interfere with existing contracts." *Bailey*, 289 Va. at 359 (quoting *Harbour Gate Owners' Ass'n, Inc. v. Berg*, 232 Va. 98, 103 (1986)). "Absent an express manifestation of intent by the legislature, this Court will not infer" an intent to interfere with rights accrued pursuant to a contract executed prior to the statutory amendment. *Id.*

In the statute at issue, there is no express manifestation of an intent to apply the statute retroactively or to interfere with the rights and obligations of contracts executed prior to the amendment. There is also no declaration that the future performance of those preexisting obligations must comply with the amended definition. Quite simply, there is nothing in the statute to indicate that the General Assembly intended a departure from the norm of a presumed prospective application, i.e., to contracts executed after the effective date of the statute.

To that end, Constellation argues that it has "vested" rights in its pre-amendment contracts such that it can rely upon the former statutory definition for the remaining duration of those service contracts where the statute evidences no manifest intent to interfere with its existing contracts. Though the Commission did not hold an evidentiary hearing or make express findings of fact on this issue, the Commission did have the materials provided in discovery—including the previously mentioned portions of Constellation's service contracts—at its disposal when considering the questions posed by Constellation's petition. We must assume that the Commission, in reviewing the terms of the contracts, determined that Constellation and its customers possessed contractual rights regarding the supply of renewable energy that accrued as a result of incorporating the former statute by reference. The statute became a material "part of the contract of the parties by mutual agreement." *See Gloucester Realty Corp.*, 182 Va. at 874. "It will not be presumed that the legislature would intentionally and advisedly amend a statute that would so materially affect such an important contract right." *Id.* Therefore, absent any

11

indication of intent to disrupt established contractual relationships, this Court will not presume that such an effect was intended.

Nevertheless, VEPCO asserts that a threshold finding of intent to apply to existing contracts is unnecessary because contracts "must be considered as containing an implied condition that [they are] subject to the exercise of the State's regulatory police power," *Haughton v. Lankford*, 189 Va. 183, 190 (1949), and that a state's energy policy and regulation of the industry are regarded as some of the most important functions of that power, *see Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) (observing that regulation of utilities is one of "most important of the functions traditionally associated with the police power of the States"); *Pacific Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983) (recognizing the traditional responsibilities of states in "determining questions of need, reliability, cost and other related state concerns" regarding energy policy).

While VEPCO is correct that contracts are subject to valid exercises of police power, "private contract rights must yield to the public welfare [only] where the latter is appropriately declared and defined and the two conflict." *Commonwealth ex rel. Page Milling Co. v. Shenandoah River Light & Power Corp.*, 135 Va. 47, 57 (1923). The General Assembly could have clearly expressed that contract rights accrued under the former statute would be subject to the amended language. As noted above, however, there is no express declaration and simply no inherent structure or language in the amendment at issue here suggesting that the General Assembly intended to invoke that power in a way that would conflict with pre-existing private contract rights. Because we find no intent to affect existing contract rights, there is no conflict between continued recognition and enforcement of those rights and the amended statute.

Therefore, we need not reach VEPCO's argument that the amendment was a valid exercise of the Commonwealth's police power.

Further, a provision in the Subsection (A)(5) retail choice program implies that the General Assembly is predisposed to the opposite intent within this particular statutory scheme. While Code § 56-577(A)(5)(a) enables retail customers' participation in the retail choice program, Code § 56-577(A)(5)(b) allows those same retail customers "[t]o *continue purchasing* renewable energy pursuant to the terms of a power purchase agreement . . . *for the duration of such agreement*" even after the incumbent electric utility files a tariff to offer electricity provided from 100 percent renewable energy. Code § 56-577(A)(5)(b) (emphasis added). Unlike Code § 56-576, which is a definitional statute, Subsection (A)(5) grants and governs substantive rights pertaining to who can participate in the retail choice scheme and in what way. Allowing customers to continue with the arrangement for which they originally contracted shows that, even in this heavily regulated industry that is subject to the Commonwealth's police power, the legislature appears inclined to leave certain contractual obligations intact despite a change in circumstances that would normally impact participation in the retail choice program.

VEPCO contends that the absence of similar grandfathering language in the amended definition means that the Court should not read such language into its terms. However, relying upon the statutory scheme for context as to how its parts should be applied is not reading language into a statute, but is applying general rules of construction to interpret the statute as part of a consistent whole. *See REVI, LLC*, 290 Va. at 208 (it is "our duty to interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal"). We find that this interpretation is the logical choice in light of the context provided by the structure of the retail choice program.

13

Lastly, in evaluating this construction of the statutory terms, we must again recognize that the Commission is due the respect of a "tribunal informed by experience.'" *City of Alexandria,* 296 Va. at 93 (citation omitted). As the body tasked by the General Assembly with overseeing not just the implementation of the Subsection (A)(5) retail choice program, but the VEURA as a whole, the Commission's determination is one viewed with deference to its expertise. Though language cannot be added by interpretation where it was not included by text, "we presume that where the General Assembly has not placed an express limitation in a statutory grant of authority, it intended for the Commission, as an expert body, to exercise sound discretion." *Virginia Elec. & Power Co.*, 284 Va. at 741. Thus, in the absence of an express direction as to how amendments to the chapter definitions should be applied, it is reasonable to assume that the Commission exercised its discretion in interpreting and applying the amended definition in a manner consistent with both the larger statutory scheme and general principles pertaining to application of new legislation to existing rights.

Therefore, it is apparent that the Commission determined that Constellation accrued contractual rights under the former definition of renewable energy, and—since the amended statute contains no express indication that it is to be applied retroactively to interfere with existing contract rights—we find that the Commission did not err in refusing to retroactively apply the amended statutory definition of renewable energy to Constellation's contracts that were executed before the amendment took effect.

III.

For the reasons stated, we affirm the decision of the Commission.

*Affirmed.*

JUSTICE KELSEY, with whom CHIEF JUSTICE LEMONS and JUSTICE McCULLOUGH join, concurring in part and dissenting in part.

I agree that the phrase "energy derived from . . . falling water" in former Code § 56-576 included energy produced by pumped-storage facilities. Effective July 1, 2020, however, an amendment to Code § 56-576 excluded from the statutory definition of renewable energy any electricity solely "generated from pumped storage" facilities. *See* 2020 Acts chs. 1193, 1194, at 2501, 2530. The majority holds that this statutory amendment does not apply to Constellation's monthly sales of electricity from pumped-storage facilities *after* July 1, 2020, because those sales were contemplated in several long-term contracts executed *before* that date.

We all agree that the legislature did not intend the 2020 statutory amendment to be applied retroactively. It was meant only to apply prospectively. We disagree, however, about what "prospectively" means. Does the 2020 statutory amendment affect monthly sales of electricity from pumped-storage facilities between Constellation and its retail customers that take place *after* the effective date of the amendment? The majority's answer is *no* — the amendment has no effect because applying it would defeat our agreed-upon premise that unless the legislature clearly says so, a new law should not "be applied retroactively to interfere with existing contract rights." *Ante* at 14. My answer is *yes* — the amendment applies to Constellation's monthly sales after the amendment's effective date because doing so involves a prospective, not retroactive, application that does not unconstitutionally impair Constellation's contractual obligations.

## I. RETROACTIVE VS. PROSPECTIVE APPLICATION

"While statutory retroactivity has long been disfavored, deciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 268 (1994). Justice Story, however, provided a clear starting point, explaining that

15

statutes have a "retrospective" application when they, "though operating only from their passage, affect vested rights and past transactions." *Id.* at 268-69 (quoting *Society for the Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (C.C.D.N.H. 1814) (No. 13,156) (Story, J.)). "The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment about 'whether the new provision attaches new legal consequences to *events completed before its enactment*.'" *Martin v. Hadix*, 527 U.S. 343, 357-58 (1999) (emphasis added) (citation omitted).

Applying that standard to the principal question in this case, the answer is uncomplicated: Constellation's sales completed before the effective date of the 2020 statutory amendment are unaffected by it, and those sales completed after the effective date of the 2020 statutory amendment are governed by it. The fact that all of Constellation's sales arise out of executory contracts existing prior to the new law changes nothing. "[L]egislation affecting *future* performance and termination of contracts in existence when a legislative act became effective" must be distinguished from "a legislative effort to make statutes retroactive so as to affect pre-statutory performance or termination of such contracts." *Heublein, Inc. v. Dep't of Alcoholic Beverage Control*, 237 Va. 192, 197 (1989) (emphasis in original). This distinction polices the maxim that "[o]ne whose rights . . . are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Working Waterman's Ass'n of Va. v. Seafood Harvesters, Inc.*, 227 Va. 101, 110 (1984) (quoting *Hudson Cnty. Water Co. v. McCarter*, 209 U.S. 349, 357 (1908) (Holmes, J.)).

The United States Supreme Court applied these principles in a closely analogous case a century ago. In *Union Dry Goods Co. v. Georgia Public Service Corp.*, the state had mandated a rate increase for sales of electricity, and the increase became effective on year two of a five-year

16

sales contract between a supplier and buyer of electricity. *See* 248 U.S. 372, 373 (1919). The Court held that the legally prescribed rate prospectively applied to all sales of electricity after the effective date of the rate increase. *See id.* at 375-77. It did not matter that the parties before the court still had three more years left on their contract subject to the lower price. On the date of the state's lawful "exercise of its police power" to regulate electricity prices, no "private contract" can thereafter supersede the uniform application of law to all buyers and sellers. *Id.* at 375, 377; *see also Producers' Transp. Co. v. Railroad Comm'n of State of Cal.*, 251 U.S. 228, 232 (1920) ("That some of the contracts before mentioned were entered into before the statute was adopted or the order made is not material.").

In another similar case, we considered whether statutes giving the State Corporation Commission "power to control, regulate, and prescribe the light and power rates of such public service corporations, operate prospectively only" and whether applying a new rate schedule to private contracts entered into before the statutes' enactment gave those statutes a "retroactive effect." *Commonwealth ex rel. Page Milling Co. v. Shenandoah River Light & Power Corp.*, 135 Va. 47, 55 (1923). Our answers to these questions were clear:

> Of course there can be no doubt about the general rule that statutes operate prospectively, and not retroactively; but it is illogical to say that the construction which the Commission has given to these statutes gives them a retroactive effect, for it is not claimed that the rates charged or collected for service performed before they became effective can in any way be affected thereby. Clearly these statutes operate prospectively, and only upon such rates as are thereafter lawfully prescribed pursuant thereto.

*Id.* at 56.

This makes perfect sense. "[A] right cannot be considered a vested right, unless it is something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws." Thomas M. Cooley, A Treatise on the Constitutional Limitations

17

511 (Victor H. Lane ed., 7th ed. 1903).  It has long been held that parties to commercial contracts in heavily regulated industries[1] must necessarily expect "that changes in the law applicable to their contracts may be made," and thus, "in the nature of things," there is "no vested right in an existing law which precludes its change or repeal, nor vested right in the omission to legislate upon a particular subject which exempts a contract from the effect of subsequent legislation upon its subject matter by competent legislative authority." *Louisville & Nashville R.R. v. Mottley*, 219 U.S. 467, 484 (1911) (citation omitted).[2]

Likewise, "there is no implied promise on the part of the State to protect its citizens against incidental injury occasioned by changes in the law."  Cooley, *supra*, at 402.  As Professor Lile succinctly put the point, "one has no vested right in a mere rule of law."  W.M. Lile, Notes on Statutes 11 (1911).  A contrary view would be wholly unworkable.  "If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever." *Landgraf*, 511 U.S. at 269 n.24 (citation omitted); *see also McCabe v. Commonwealth*, 274 Va. 558, 566 (2007) ("[A]s a general proposition, there is no right to rely on the continued existence of civil statutes.").  Nothing in our law permits a party to "obtain immunity from the state regulation by making private contractual arrangements." *United States Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22 (1977).

Here, by enacting the 2020 statutory amendment, the General Assembly did not attempt to unravel Constellation's monthly sales of renewable energy from pumped-storage facilities

---

[1] As a "[c]ompetitive service provider," Constellation is heavily regulated by the State Corporation Commission.  *See* Code § 56-577(A)(5) & (B); 20 VAC §§ 5-312-10 to -110.

[2] *See also National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 469 (1985); *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 416 (1983).

18

before the effective date of the 2020 statutory amendment.[3] Those sales were lawful at that time. After July 1, 2020, however, the legislative intent is unmistakable: Going forward — that is, prospectively — electricity solely generated from pumped-storage facilities can no longer be deemed to be lawful renewable energy. Looking backward — that is, retrospectively — the 2020 statutory amendment said nothing because nothing needed to be said. As of July 1, 2020, what was done was done, and the new law did not disturb it.[4] Constellation had no vested right in the assumption that the legislature would never change the legal definition of renewable energy during the multi-year duration of its executory, retail contracts — particularly since the definition of renewable energy had already been statutorily changed in 2008, 2009, and 2012.

In short, I agree with the majority that if the General Assembly intends to apply a new law retroactively in a manner that "attaches new legal consequences to *events completed before its enactment*,'" *Martin*, 527 U.S. at 358 (emphasis added) (citation omitted), the legislature must expressly state such an intent, *see City of Charlottesville v. Payne*, 299 Va. ___, ___, 856 S.E.2d 203, 209-10 (2021). But we have never held that the General Assembly must expressly state its intent that a new law will apply prospectively. That intent is inherent in the very nature of

---

[3] This fact renders irrelevant Constellation's heavy reliance on *Bailey v. Spangler*, which addressed the retroactive application of a statute to deeds executed and to vested property rights transferred before a new statute's effective date, *see* 289 Va. 353, 358 (2015). Neither *Bailey*'s facts nor its legal analysis addressed the prospective application of a new law on events completed after its effective date. The same can be said of *Ferguson v. Ferguson*, which dealt with the retroactive application of a new statute to a will contest that was filed before the statute's enactment and challenged a will offered to probate before the statute's enactment. *See* 169 Va. 77, 86-88 (1937).

[4] *See* 2008 Acts ch. 272, at 409; 2009 Acts ch. 748, at 1595; 2012 Acts chs. 46, 200, at 62, 317.

19

legislation because a "statute is always to be construed as operating prospectively," *Allen v. Mottley Constr. Co.*, 160 Va. 875, 881 (1933) (citation omitted).[5]

## II. IMPAIRMENT OF THE OBLIGATION OF CONTRACTS

To be clear, I accept that Constellation's executory, retail contracts are "contracts" within the meaning of the provisions in the Virginia and United States Constitutions that prohibit laws "impairing the obligation of contracts," U.S. Const. art. I, § 10, cl. 1; Va. Const. art. I, § 11. But this fact tells us nothing about whether Constellation's contractual *obligations* were impaired by the prospective application of the 2020 statutory amendment. I do not see how they could have been.

Constellation's retail contracts did not require it to sell electricity generated from pumped-storage facilities. *See* 1 J.A. at 148. The contracts only promised that customers would receive 100% renewable energy from statutorily recognized renewable-energy sources. *See id.* Those sources could include wind, solar, biomass, waste, landfill gas, geothermal, inter alia — not just "falling water" at pumped-storage facilities. The 2020 statutory amendment simply took one renewable-energy option off the table, leaving all others wholly untouched. As a matter of law, therefore, the 2020 statutory amendment did not impair Constellation's contractual

---

[5] The legislature has the power to grandfather unvested contractual expectancies by postponing the effective date of a change in the law for the duration of preexisting contracts. The legislature did just that in Code § 56-577(A)(5)(b), by permitting retail customers "[t]o continue purchasing renewable energy pursuant to the terms of a power purchase agreement in effect on the date there is filed with the Commission a tariff for the incumbent electric utility . . . to offer electric energy provided 100 percent from renewable energy, for the duration of such agreement." This grandfathering provision, however, does not apply to Constellation's existing retail contracts regarding electricity provided from pumped-storage facilities because the statutory amendment removing electricity generated by pumped-storage facilities from the definition of renewable energy was effective on July 1, 2020, and because the incumbent electric utility did not file a tariff with the Commission until July 2.

20

obligations because Constellation was never legally obligated to provide electricity generated from pumped-storage facilities.

Even if Constellation had an enforceable obligation (rather than a self-determined option) to provide electricity from pumped-storage facilities, the prospective application of the 2020 statutory amendment to monthly sales after the amendment's effective date would not be an unconstitutional impairment. "While the Contract Clause appears literally to proscribe 'any' impairment, the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." *United States Tr. Co. of N.Y.*, 431 U.S. at 21 (citation omitted). "The threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment,'" and "[t]he severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). "Minimal alteration of contractual obligations may end the inquiry at its first stage." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978). "[S]tate regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment," and "[i]n determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past." *Id.* Because Constellation could fulfill its retail contracts by providing renewable energy from other statutorily recognized renewable-energy sources and because Constellation is operating in an industry that has been heavily regulated in the past, any impairment cannot be considered substantial.

To be sure, even if the 2020 statutory amendment had substantially impaired Constellation's contractual obligations, it still would not be an unconstitutional impairment if there was a reasonable police-power justification for doing so. Under settled law, "a contract . . .

21

must be considered as containing an implied condition that it is subject to the exercise of the State's regulatory police power." *Haughton v. Lankford*, 189 Va. 183, 190 (1949); *see also Working Waterman's Ass'n of Va.*, 227 Va. at 110. We have described the "police power" as the inherent, sovereign power "to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity." *Elizabeth River Crossings OpCo, LLC v. Meeks*, 286 Va. 286, 321 (2013) (alteration and citation omitted).

The General Assembly's regulation of the supply of electricity to Virginia citizens and industries to promote efficiency, reliability, and environmental compatibility falls squarely within the historic definition of the Commonwealth's police power. *See generally Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) ("[T]he regulation of [retail electric and other energy] utilities is one of the most important of the functions traditionally associated with the police power of the States."). Anticipating prospective application of new laws, "contracts are deemed to implicitly incorporate the existing law and the reserved power of the state to amend the law or enact additional laws for the public welfare." *Smith v. Commonwealth*, 286 Va. 52, 58 (2013).

### III. CONCLUSION

In sum, I agree that the phrase "energy derived from . . . falling water" in former Code § 56-576 included energy produced by pumped-storage facilities. I respectfully disagree, however, that the presumption against retroactivity required the General Assembly to expressly state that its 2020 statutory amendment governs prospectively — as it does here — to Constellation's monthly sales after the amendment's effective date.

I thus concur in part and dissent in part.